Good morning, and may it please the Court, my name is Susan Oxford, and I represent the Appellant Equal Employment Opportunity Commission in this matter. I would like to reserve five minutes of my time for rebuttal. Thank you. As this Court is aware, this is the second time this case has come before you. Although the Navajo Nation was not involved the first time, the appeal involves the same question of civil procedure under Rule 19 that this Court already resolved, along with a new substantive legal issue under the Rehabilitation Act of 1950 involving the Navajo and Hopi Tribes, and several other various procedural and evidentiary questions. Although the parties' briefs are lengthy, this Court's prior ruling provides a solid yardstick against which it becomes clear that the District Court erred. I would like to focus in particular on three of the issues we addressed in our briefs. First, the District Court erred as a matter of law when it concluded that the EEOC's amended complaint, which names the Navajo Nation as a Rule 19 defendant, seeks any kind of claim or affirmative relief against the Navajo Nation. Second, the District Court erred as a matter of law when it concluded that the Navajo-Hopi Rehabilitation Act of 1950 authorizes PB to give hiring preference to Navajos in its private coal mining operations, notwithstanding the provisions of Title VII that make such preferences unlawful. And third- Excuse me, Counsel. Yes. I have a question that gets to that second point that you just made. Okay. When I looked through the brief, I did it with a mind to that Dawaaba Denda piece that says under Title VII, there is no justification for discriminating in favor of one tribe and against another. But when I looked at your brief, it looks to me as though your brief is not really arguing that under Dawaaba Denda, discrimination in favor of Navajos and against Hopis is what makes the lease unlawful. Rather, you're taking a broader view on the procedural and jurisdictional grounds and also a view that discrimination in favor of the Indians is unlawful. Do I have that right? It looks to me as though if we get past all the jurisdictional and procedural issues, then you've waived the point that under Dawaaba Denda, there's a Title VII violation because there's discrimination in favor of Navajos and against Hopis. No, that's not correct. The reason that our brief reads that way is because this is primarily still at the early procedural stage of whether or not we can proceed forward naming the Navajo Nation as a Rule 19 defendant. This court was explicit in the prior decision that you did not reach the merits of the case and you left open, notwithstanding the ruling in Dawaaba Denda, which simply construed the relevant provision in Title VII to mean that a private business cannot discriminate against the members of one tribe in favor of the members of one tribe against the members of another tribe, which is non-Indians. You use the phrase, the reason the brief reads that way, so I take it you're conceding that that point is not briefed, but suggesting that at a later stage of litigation it would be. In a footnote, we point out to this court that this court has already resolved that question under Dawaaba Denda, so we do not back off from that position at all. There are two, you could say there are two categories. Can I interject for a minute? Getting past for the moment the Rule 19 point, let's assume for purposes of argument that the Navajo Nation is properly here under Rule 19 and let's assume for the moment that the Department of the Interior or the Secretary of the Interior is, however that happens to be resolved, that that's okay, that we go to the merits. Your argument, as I understand it, is that Title VII by its own terms governs and that the Rehabilitation Act by its own terms doesn't apply. That's exactly correct. That's the argument? Yes. And the district court reached that by converting the Navajo Nation's motion to dismiss into a motion for summary judgment on that sole point. And on that sole point... If we get past the conversion of the motion, I do not see, at least from my look, and you'll educate me if I miss something, I do not see any conflict between the Rehabilitation Act and the Leasing Act, and it looks to me as though they both apply. I don't understand why one would apply but not the other. I agree there's no conflict, but that's only because the Rehabilitation Act does not apply and the Indian Mineral Leasing Act of 1938 does. Can I... Why isn't the Rehabilitation Act applied? Oh, I'm sorry. No, no, please go ahead. I'll follow on as soon as you're finished. I would be happy to explain that. And we cite the, or we provide the court with the relevant portions of the Rehabilitation Act in an addendum to our opening brief, and if you look at that, it says the hiring preference provision is found in Section 633, which says, Navajo and Hopi Indians shall be given whenever practical preference in employment on all projects undertaken pursuant to this subchapter. And if you look at what are the projects undertaken pursuant to this subchapter, those are listed in Section 631. And there, Congress in 1950 said that the Secretary of Interior is authorized and directed to undertake the following, a program of basic improvements that includes the following projects. So, Section 633 permits a preference in employment in projects, and Section 631 lists the 14 projects the Secretary of Interior is authorized to undertake with the $108 million that Congress authorized for this purpose. Those are the only projects that are authorized under the Navajo-Hopi Rehabilitation Act of 1950. Now, it is clear that the reason Congress did this, the reason Congress invested $108 million, was to make infrastructure improvements and to provide other necessary groundwork so that private businesses could come in and develop jobs for Navajos and other people in the area to provide them with economic sustenance. If I could interject at this point, you've referred to Section 631 of the Act, listing various projects and the funding. You've described 633 of the Act saying, with respect to projects, I'll say Title 7 doesn't apply. They can hire who they want to hire within the tribe. Then we move to 635, and 635 authorizes leases of reservation Indian-owned land. And I gather your argument is that project has a special definition coming out of 631, and that leases of mineral lands under 635 are not projects within the definition. Does it actually say mineral lands under 635? I'm sorry, I don't have that provision right in front of me. It says development or utilization of natural resources in connection with operations such leases. So it'll be natural resources, which would then include minerals. And it's the government's position that that exclusively refers to the development of something where natural resources would be used, perhaps a resort where you would be using the water resources to prepare a spa or some kind of recreation, or mountain areas where you'd be, again, a resort area where you'd be preparing hiking. You know, that strikes me as an ambitious and, to me, not particularly convincing argument. Natural resources and leases sounds like mineral leases to me. But I would say this, that it doesn't sound like project within the meaning of 631. Project is something that's funded by government appropriations, and the word project nowhere is here under lease, and the lease doesn't sound like a project as that term is used in 631. Absolutely. And there are regulations that implement Section 635, and those regulations expressly state that they exclude mineral leases. Ah, OK. So the regulations that say mineral leases aren't covered? That's right. And I can't give you the exact page, but we cite that in our brief, that regulation. Where's the reg now that says mineral leases aren't covered? I can find that for you. I know it's said in our brief, but I don't have it on the tip of my tongue. I'm sorry. I thought the projects in 633 and 631 were the ones where the federal government spends money, and 635 means there can be additional things that the government approves so that the Indians can make money without the federal government spending money. That's correct. Those are leases with private businesses, but the 635 leases exclude mineral leases. And the regulations, I think it's referenced in the statute. If you look at the notes beneath the statutory provision, it will give you the regulatory site, and those regulations expressly exclude. OK, I got it. And let me also say that Section 633 that gives the hiring preference continues to say that the secretary or it doesn't say the secretary, but that the hiring preference is available without regard to provisions of the civil service and classification laws. Further evidence that Congress had in mind is the secretary was going to either be hiring employees to do this work or giving out contracts to do this work, and that ordinarily the secretary is limited in its hiring to civil service law. I'm not sure I'd read it that broadly. I would read it not the secretary would be, but rather than the secretary could be. That is to say, some of the hiring might be done by the secretary, but I don't think all of it needed to have been done. In fact, I'd be rather surprised if they contemplated that all of it would have been done. Well, right. Some of it would have been done by private contracting, the federal contractors. But nevertheless, under it's the secretary spending the money, and the secretary was authorized on these 14 projects to have a Navajo hiring preference. The other thing that's relevant to determine congressional intent in the Rehabilitation Act is that Congress said to the extent possible these projects should be completed within 10 years of their start date, which was 1950. So first of all, this was 14 years before Congress enacted the Title VII of the Civil Rights Act, 15 years before it went into effect. And the 10 years of completion, targeted completion time, would bring us to 1960. Do we know in the record whether or not there have been projects funded under the Rehabilitation Act past that date? The Equal Employment Opportunity Commission submitted the report of a member of an official in the Department of Interior who did a 1973 study of expenditures under the Rehabilitation Act of 1950. And those expenditures end in early 1960. Is that the disputed Taylor report? Which at the moment is not in the record. Taylor report. That's correct. And that's another issue on appeal that we ask this question. Is that the only thing in the record that speaks to whether or not there's been funding under the Rehabilitation Act past the 10-year period? It's the only thing we're aware of that speaks to it. There's nothing that indicates funding has taken place past it. And this we would submit indicates funding has not taken place. And we would rely on our brief, unless the court has questions, we would rely on our brief for why that was improperly excluded and why it meets all of the federal rules of hearsay and authentication to be submitted. Why would Title VII not be constricted so that it does not reach this because of the subsection I in 2008-2002? And nothing contained in the Title VII title applies to any business on or near an Indian reservation with respect to a publicly announced employment practice to give preferential treatment to an individual because he's an Indian living on or near. And that's the issue that this court decided in Gower-Vandula I, the first Gower-Vandula decision, which we cite in our brief and rely on and have not at all repudiated or waived. And that is because Congress, if it wanted to authorize preferences in favor of one tribal member over another, could have said so. It would be easy to do. Instead, it used the phrase Indians, that a preference can be given to any individual because he is an Indian living on or near a reservation. We think this court's analysis in Gower-Vandula I is exactly correct. It's consistent with the policy guidance that the EEOC issued in 1988, clarifying the EEOC's interpretation of this provision. It is also consistent with the Department of Labor's regulation, subject to notice and comment, which the Department of Labor issued even earlier in 1978. If we were to agree with you that the on or near provision is the only one that's relevant, that's to say that the Rehabilitation Act is off the table for our purposes, and if we were to agree with you on the other procedural points, do we have to remand for a determination of on or near with respect to these plaintiffs? Not for that, no. What you would remand for is a determination of whether Peabody or the Navajo Nation, although with no claims against it, could articulate any legal defense to EEOC's claim against Peabody. That has never been reached on the net. I see, so legal defense might include on or near, but might include other things as well. It can't include on or near because this court has already construed that. I guess my question is a very precise factual one, not a legal one. Do these plaintiffs live on or near? Okay, that has never been reached. Yes, they did. They did, but that fact has never been, this case has never been subjected to any discovery. That factual determination would have to be made. Yes, that's correct. Peabody's initial pleading did not admit that. Its initial pleading said that the case could not proceed without the Navajo Nation as a party. One would think they wanted the Navajo Nation to be a party, but as soon as we pled the Navajo Nation as a party, they then joined the Navajo Nation, saying it should be dismissed because the Secretary of Interior was not a party, an argument they had never previously made. If the Dawah Vedenda argument is what takes Title VII out or keeps it in, number one, I don't understand why it's not briefed. And number two, well, I'll let you ask that first, and why the Hopis don't file a brief here. That's a good question about the Hopis, but these particular leases take place on Navajo land, and there's a separate lease that governs Peabody's coal mining operations on the Hopi Reservation. I see. Now, that leads to my next question. It looks to me as though if you win, the federal government is immune from any monetary liability. Nothing happens to the feds. The Navajos have their tribal immunity that will protect them, and Peabody Coal, the company that was induced to go on the reservation and create jobs for the Navajos on the Navajo Reservation, and has also gone on the Hopi Reservation and created jobs for the Hopis, Peabody gets a big retroactive damages judgment against it. Is that the way it comes out as a practical matter? That issue has never been briefed, and that issue is not before this court, and frankly I'm not in a position to address it. That is exactly why a remand would be appropriate so that the case could finally move forward to the merits. Well, you know, that's a kind of a dodge. It does seem to me that Judge Kleinfeld has it right that the Navajo would be immune from a damage judgment, that the federal government would be immune from a damage judgment. There is sought here a damage judgment against Peabody Coal, and if it turns out that Peabody Coal is violating Title VII, that's an if, but if it turns out they're violating Title VII, I assume they've got to pay some money, and I don't see where they can go to get some sort of reimbursement or indemnification unless out of the goodness of its heart the federal government coughs up, finds something of that $700 billion to give to Peabody Coal, or maybe the Navajo Nation gives them something. How do we escape from that? Neither the Navajo Nation nor the Secretary of the Interior could authorize Peabody to violate a federal law that Congress enacted in 1964. That argument of fairness is exactly the type of argument I anticipate Peabody would make before the district court. If Peabody has to pay money damages for violating the law, it would not be the first time that a private business proceeded forward under, for instance, a state regulation that requires it to do something that's inconsistent with the ADA. Counsel? Yes. Counsel, I think it would be the last time that anyone invests substantial money in creating jobs on an Indian reservation, wouldn't it? I don't think so. I think it would be the start of a careful effort to make sure that leases comply with Title VII. It's extremely simple to make this lease comply with Title VII. The hiring preference just needs to be changed from preferring Navajos to preferring Native Americans. Well, the extent of liability that Peabody Coal would have would be only the liability they would have to non-Navajo or non-tribal members on other leases living on or near the reservation because they're perfectly entitled under Title VII to discriminate against anyone, including Indians, who do not live on or near the reservation. That's correct. This is not a class action. This is an action for the particular individuals. That's correct, one of whom has already died, and there are two other named charging parties who filed charges with the EEOC. Those are the only two I'm aware of. Two Hopis and a total of one is deceased. Correct. So what we're talking about is damages for the two, right? That's correct. If it gets to that point, it's Peabody doesn't have some other defense on the merits. Yeah, that's what I mean. Sorry, go ahead. Well, I just wanted to clarify that we're talking about possible damages for the, what, two individuals? Two individuals is all that I'm aware of, yes. That's correct. Is there a statute of limitations problem comparable to, is there a statute of limitations problem with respect to sort of a large amount of retroactive liability that Peabody Cole or others in Peabody's position might owe? It's only a limitation on how far back from the date the charge was filed. So the charge, there's no, because this has taken so long to go through the up and down the court of appeals, that does not impose a limitation. Right. Well, what I'm after is Judge Kleinfeld's concern, which seems to me perfectly sensible as a concern. Okay. If we were to hold that this lease is governed by Title VII but is not, the hiring preference is not protected, if I can say it that way, under the Rehabilitation Act, that opens the door to, I don't quite know what the numbers would be, but the liability to all Indians who have lived on or near reservations, who have sought employment and have been denied employment. I'm trying to figure out, okay, now here comes the, quote, wave of litigation. What's the statute of limitations with respect to that new litigation coming in? How far back can they ask for damages? No one who has not already filed a charge could come in now on their own and ask for damages. The Equal Employment Opportunity Commission filed our complaint in June of 2001. So conceivably, if we performed discovery and found there were other individuals. I'm not interested in this particular case. I'm interested in other cases. Right. Two years of back pay from whenever someone files a charge. I'm not sure I understand that, the application of the statute. You say it's just someone come in now and assert back pay? We don't know if PBD has continued to maintain the same policy of screening out non-Navajo Native Americans. I'll assume they have. Okay. So if they have, an individual could conceivably come to EEOC's office in Phoenix and file a charge. And if they did, and it turned out they were excluded in violation of Title VII, if they prove their case, they would be entitled to back pay for possibly two years prior to when they filed their charge. Although their charge itself, to be timely, must be filed within 300 days of whenever they were not hired. So assuming they filed a timely charge, then, well, and in that instance, the back pay would only go to the date of non-hire. So actually, the two years covers ongoing discrimination, for instance, if there was a sexual harassment claim and you were looking for, or a failure to promote claim, you might perhaps be able to demonstrate going back further in time. But in a case like this, the charge must be filed within 300 days of the date of the discrimination, the non-hire, and you would only be entitled to back pay from the date you were not hired until the date of a judgment in your favor. I see. So if we were to eventually come out with a holding in your favor on this point, anyone who had not filed a discrimination charge in a fairly short period before that is going to be barred because of the 300-day rule. That's correct. Okay. And I see that I've gone beyond my time. I know that. Judge Kleinfels, you have, go ahead. No, it's not important. Would I be permitted any rebuttal? Yes. We'll give you some time to respond. Thank you. May it please the Court. I'm Paul Fry representing the Navajo Nation. I'd like to answer Judge Kleinfels' question accurately. The prayer for relief requests an order to Peabody to make whole charging parties in a class of similarly situated non-Navajo Native Americans by providing appropriate back pay with prejudgment interest as well as punitive damages. This is the record excerpts provided by the EEOC at page 45. So this is a requested class relief with punitive damages and back pay attached to it. And would the members of the class be a different class than has just been described to us in terms of the 300-day rule and statute of limitations? It would seem to me that the class would be people who were similarly situated to these two charging parties who apparently applied for Peabody's employment eight years ago. And do we know how many there are? No. Do we know if there are any? We don't know if there are any or how many there are because Peabody hasn't moved under Rule 12. Excuse me, EEOC hasn't moved under Rule 12. It has not been certified as a class action. It has not been. That's correct. So that would be... Judge Kleinfels, as I recall from another case I had involving this reservation at Russell Means... Yes, sir. There's a lot of intermarriage between Navajos and others and a lot of people that live on the Navajo reservation that are not Navajo tribe members, members of other tribes. Is that correct? There is some intermarriage there, yes, and Russell Means is a good example of that, Your Honor. I'd like to talk about what I think are the two straightforward ways for this court to handle this case. The first is premised on the following facts. The Secretary of the Interior, Stuart Udall, at the time testified that his department personally and under his personal supervision negotiated, drafted, and approved these leases. They required, as Peabody's own counsel's affidavits say, they required Navajo preference to be in these leases, and there are 326 other leases on the Navajo reservation with this very provision in them, all approved by the Secretary of the Interior. Are those other leases in the record before? They are, Your Honor. And do we know whether those are active leases, old leases not under, and so on? Yes. The leases will show what their date of inception and the term are, so almost all of them, I think, if not all of them, are active leases. But there are only 326 leases comprising the entire foundation of the Navajo economy in an area the size of West Virginia where there's 48% unemployment. Now, not only that, the Secretary of the Interior has had since at least 1957 a nationwide policy of requiring tribe-specific preferences in mineral leases under the 1938 Indian Mineral Leasing Act. And, of course, that's not mutually exclusive with the Rehabilitation Act. Section 396D of the Title 25 in the 1938 Act says that leases granted under both the Indian Mineral Leasing Act and under any other act relating to natural resources and minerals shall be under rules and regulations to be promulgated by the Secretary. The Secretary promulgated his rules. One of the rules was the leases are going to be on forms that I prescribe, and he prescribed form leases, and they require tribe-specific preferences. What the EEOC is missing is that Title VII, as I think the Supreme Court outlined in Morton v. Mancury, doesn't talk about Indians as an amorphous blob. It's tribal and reservation-based employment that Title VII exempts. What do we do about the specific ruling in Dowlavindua? I think the specific ruling in Dowlavindua I was carefully cabined in Dowlavindua II, where it said all we decided in Dowlavindua I was that this tribe-specific claim that Dowlavindua brought stated a claim for relief. That's all that was decided in Dowlavindua I. I don't know how that can be said, because it was very particular going through the distinction between the two statutes, saying that, well, specifically that because he is an Indian living on a reservation, he's very different from the tribal thing that you're talking about. Yes. Judge Hogg, all that I'm saying is what was said in almost those words in Dowlavindua II. I don't know if it was a retreat or if it was just a caution to the advocates, but what I recall Dowlavindua II saying is we did not decide the merits of this case. What we decided was that Dowlavindua had stated a claim for which relief could be granted. And I think that's explicit in Dowlavindua II, Your Honor. How does that help? It seems to me that once you say it states a claim, you're saying there is a legal principle that while there can be discrimination in favor of Indians as described in the exception, there can't be discrimination in favor of one tribe against another. It seems like limiting it to 12b-6 doesn't help very much, and I don't know quite what to do about that. I think it does help in that Dowlavindua II, I think, or Dowlavindua I did say that it does state a claim under 12b-6, and that I think as a general principle would say that there's some violation of law that might be lurking there. But I don't think Dowlavindua I or II took a look at the Navajo rights under the treaty, the right to exclude and condition the entry of non-members seeking to do business there, the consistent position of the Department of the Interior honoring that and, in fact, requiring that as a condition for anybody to get a lease on Navajo lands, they have to agree to prefer Navajo-qualified workers. What about the specific issue in number one as to whether they stated a claim or not would be the interpretation of the two statutes? They wouldn't state a claim if there were no distinctions between the two. They would state a claim if there is a distinction. They found there was a distinction. That's correct, on that limited record and without these other arguments, Your Honor. But my point here is that the Secretary of the Interior — Well, it wasn't a record. It was looking at two statutes and determining what the two statutes meant. Well, but it wasn't looking at the Navajo Treaty, and it wasn't looking at the Rehabilitation Act, and it wasn't addressing the argument that the Navajo Nation is making now. Well, we're not bound by that as a matter of res judicata, collateral estoppel, or law of the case. I think that's fairly clear, Your Honor, under this Court's determination in, for example, the Brown case that we cite in our brief. The Secretary's — Well, the problem is we're stuck with this language on page 1121 of the Waba Denda I stating the law, that the exception applies to preferential treatment given to an individual because he is an Indian. An employment practice of giving preference to a member of a particular tribe does not afford preference to an applicant because he is an Indian, but rather because he's a member of a particular tribe. I realize it's not law of the case, but it's precedent that we're bound by, and we can't violate our precedent. That's why I'm so puzzled about how to proceed. Yes, Your Honor, and I agree that this panel is bound by panel precedent, but I don't think that panel precedent governs this case with these arguments. It didn't address the arguments that we're making now based on the indispensability of the Secretary, whose leases are being challenged as illegal. If we get past — I'll get back to that in a minute — but if we get past the various jurisdictional and procedural obstacles to the merits, are you able to say one way or the other whether this Waba Denda issue under Title VII is waived by the way EEOC briefed it? I believe that, frankly, I'd like to say yes, but I think in all candor that that issue has not been waived by the EEOC. We haven't gotten that far past the procedural aspects of the case to that aspect of the merits. Now, assuming for the moment, for purposes of this question and argument for a moment, that there's some wiggle room under the Dawa Denda case and that we're approaching this as a fresh argument, and you say there's something different about the Navajo compared to what was going on in that case, and there are different arguments now made that maybe would have been available then had they been thought to make them. What are those arguments? Number one, Rehabilitation Act, I assume. What else? The Navajo Nation's rights under its treaty to condition the entry of non-members that was certainly underscored and emphasized in Williams v. Lee. And this court in Nevada said- And treaty, of course, can be overridden by statute. Pardon me? Treaty can't- Oh, absolutely. And if Title VII overrides the treaty, that's the end of that argument? Well, in order for Title VII to override a treaty, it has to do so in a very express and clear manner. This clear statement rule applies to any statute of general applicability under this court's decision in Smiskin. And I don't see that clear statement anywhere. As a matter of fact, I see the opposite. I see the opposite trend, at least. And the third defense here is under Title VII itself, the division of authority between the EEOC and the Attorney General is clear. If the case involves governments, government agencies, then that's a case that has to go to the Attorney General. I don't read that part of the statute the same way you do. It's a very long statutory section, as you know. It starts out by saying if the suit is against a governmental agency. And then later on, as I read, there's a shorthand reference to that. It talks about involves. But the operative language that I think you need is the language at the beginning of that section. And that talks about not involved but against. And that brings me to the-unfortunately, I don't think I expressed well what the first straightforward way of dealing with this case is. And that is the Secretary's indispensable. The EEOC is necessarily challenging these leases that the Secretary administers and drafted. It's illegal. If the Secretary were here, what would you do? That is to say, what is it about the Secretary's presence that's indispensable? Well, the Secretary, without the Secretary being present, I think the Secretary's in between a rock and a hard place. The Secretary can either say, oh, gee, I made a mistake over the last 50 years, not only on this reservation but on mineral leases throughout the nation that might get unraveled. If the Secretary's between a rock and a hard spot, if it's merely the Secretary's problem, the Secretary can intervene. The question is, why is the Secretary's presence indispensable to the parties now in the lawsuit? Because Peabody would be between a rock and a hard place without the Secretary. And what would Peabody want if the Secretary were here? What relief would Peabody be asking for from the Secretary? Could I leave that to Peabody, Your Honor? Well, yes, but I'll signal to you that I rather think the government's argument, well, you've got 14A as a third-party complaint. If you're trying to bring in the Secretary for declaratory or injunctive relief, you don't need Rule 19. You've got Rule 14. So that's where my question is going. Thank you very much. And the – okay, that was my third – Well, I think the Monterey mechanical decision is the one that Peabody relies on most as putting the onus on the plaintiff to join the government and not under a defendant who may or may not be able to join that same governmental entity. But, I mean, the question to me really boils back to Judge Kleinfeld's earlier questions. How many of these do we think we want to unravel? We've got 326 leases on the Navajo Reservation, mineral leases on – Is this a policy question that we can't really face in this – we're dealing with this particular situation? Are we concerned with it being bad policy? Your Honor, that's a fair question. And my response is that the fact that for 50 years the Secretary of the Interior has consistently interpreted the Rehabilitation Act to apply to business site leases on the Navajo Reservation and required Navajo preference provisions in each of those leases means that there is a consistent position of the agency in charge for the interpretation and application of the Rehabilitation Act that ought to govern in absence of something other than counsel's arguments. Yeah, although it's ironic that I should raise it in this form. The record of the Secretary of the Interior with respect to Indian tribes in terms of following the law is not an altogether unmixed record, as you undoubtedly are aware. Indeed, Your Honor, thank you. You're usually on the other side from the Secretary on these questions. And I'm prepared to answer any other questions of the panel. So I guess what you'd be saying is, if I understand this right, this is kind of a dispute between two agencies, the EEOC and the BIA. The BIA has a consistent 50-year pattern of interpretation of the statutes that it's charged with applying, so we ought to defer to its interpretation of its own statutes. That's correct, Your Honor. And the Department of Labor solicitor, in fact, also approved of the Navajo preference provisions as an appropriate exercise of Navajo rights under Title VII. That's clear. So thank you very much. Can you please record? I'm Mary Bruno, and I'm here on behalf of Peabody Western Coal Company. And I would like to specifically address the fact of the Navajo Nation's presence as a defendant and what that has crystallized for Peabody in terms of the release that's being requested. First of all, the preference provisions were, in fact, required by the Secretary of Interior and drafted by the Secretary of Interior pursuant to the Secretary of Interior's congressional mandate. Now, the record is undisputed on that point. However, the EEOC's position at this point in time can be braced down to one point. The Secretary of Interior got it wrong. The Secretary of Interior got it wrong for the last 47 years since the preceding drilling and exploration permits for these leases were approved in 1961 going forward all the way through to today. Now, you've all obviously addressed your questions to the fact that this lease provision is, in fact, in these leases. It's in form leases promulgated by the Secretary of Interior. And from Peabody's perspective, the EEOC's suggestion that the Secretary of Interior does not have an interest in this litigation is inaccurate. Under Rule 19, the Secretary's interest is clear. The Secretary is charged with responsibility for these leases. What could you get from the Secretary? Suppose the Secretary were joined. What could you get from him? Your Honor, our hope would be that if the Secretary of Interior were here, we could, first of all, get clarity on the Secretary of Interior's position regarding the continued validity of these leases. This Court has regularly recognized the... I mean relief. We're looking at an indispensable party. I want to know relief. Ideally, we would like to not be responsible for the financial damages that the EEOC asks for in its prayer. I mean, we were required in order to get these leases to, in fact, abide by these provisions that the Secretary of Interior required. The EEOC is now saying well after the fact that these leases contain illegal provisions based upon its interpretation of Title VII. Let me interrupt for a second. I understand, and I'm sympathetic with your statement. Well, if we're held liable here, we'd like some relief. We'd like some reimbursement from the Secretary. How will Rule 19 join to get that money out of the Secretary? Well, Your Honor, I mean, we would... I mean, the Secretary is immune from damages to the extent the Secretary chooses to assert the immunity. I understand, Your Honor. I am fully aware of that, which from our perspective makes the Secretary, you know, while... Indispensable. Indispensable, but absolutely unhelpful on the question of whether you're going to get any money. So, therefore, I think not indispensable on that ground. But, Your Honor, the real question that remains, notwithstanding the damages issue, the question that remains for us and for the Navajo Nation, given the Secretary's exclusive authority to cancel these leases, to amend or modify these leases, is what's the validity of these leases? If this term is unraveled, this term is material. I'm sorry, Your Honor? I'm not sure he can amend or modify without the Navajo Nation. The Navajo Nation has to have a role in the amendment or modification. But the Yavapai Prescott case specifically states that it is the Secretary of Interior who has to do the amendment or the modification. So, we can't... And you all have recognized, I'm sure you recognize it. It is not clear to Peabody that the interest of the Secretary of Interior will be the same as the interest of the Navajo Nation on this score. It is not clear to us that the Navajo Nation can, in fact, carry forward this lawsuit protecting the Secretary of Interior's interest and that, at the end of the day, we're going to wind up with a consistent position. Now, let me ask you, I'm still on the Rule 19 question. What prevents the Secretary from being named? Is there any procedural obstacle that would prevent the EEOC from bringing in the Secretary? Your Honor, I believe that the Secretary of Interior could attempt to do that. Excuse me, the EEOC could attempt to do that. However, the Secretary of Interior has clearly not consented to come into this action. And I believe the Secretary of Interior would, in fact, have to consent. So, notwithstanding this, the EEOC could name... Here's what I'm driving at. The way a Rule 19 question comes up or the way... The reason a Rule 19 question perseveres is that there's inability to get your hands on the absent party. Sometimes it's subject matter jurisdiction because it'll defeat diversity. Sometimes it's sovereign immunity, as in this case. I'm asking you, is there some sovereign immunity or other inability that would prevent the United States government, or excuse me, the Secretary of Interior from being joined in this lawsuit, either under Rule 19 or under Rule 14? I believe that the Secretary of Interior would assert sovereign immunity as a prevention under either of those rules of civil procedure. Oh, in other words, they're not suable because they're not suable? But, of course, they have sovereign immunity damages. They don't have sovereign immunity declaratory injunctive relief. Your Honor... Or am I wrong on that point? My understanding is that they have sovereign immunity and that they have... that the EEOC, if it was inclined to join them, would not be able to do so under either statute for purposes of either... certainly for purposes of damages. Your question with regards to focuses of injunctive relief or some other form of declaratory relief, I believe the Secretary would take the position that they're also immune from that. I mean, the Secretary of Interior has been essentially... the last time he approved this lease was in 1999. Well, no, I'm sorry, back up. You say you believe the Secretary would say that he is immune from a suit for injunctive relief? On what basis do you say that? Well, our reading of the cases that are cited in the brief regarding the joinder of the Secretary and the indispensability issue... but the standard rule in sovereign immunity is that the sovereign is immune from unconsented damage suits. But specific relief such as injunctive or declaratory relief, naming the individual officer, that's available despite the defense of sovereign immunity. That's standard sovereign immunity law. But, Your Honor, the EEOC... And do you disagree with that? I don't disagree with your statement, but what I'm saying... But from Peabody's perspective, that does not get us to... do we have a continued viable set of leases with the Navajo Nation when these terms are unraveled? But I'm still on this question of indispensability of the Secretary of Interior. It seems to me that if you really wanted the Secretary of Interior to come in here and say, well, listen, are you... for declaratory and injunctive relief, you can either bring in the Secretary under Rule 19 or you can bring the Secretary under Rule 14. But, Your Honor, bear in mind, while we would like this Court to rule that the Secretary of Interior is necessary under Rule 19, we were not the moving party in terms of this motion to dismiss. We have joined the Navajo Nation. We do believe that their arguments crystallize the necessity of the Secretary of Interior because they've essentially told us that the Secretary of Interior is critical, not just optional, but critical to this leasing process. So the suggestion that we could bring them in by Rule 19 or Rule 14, that's why we're here. I mean, we think that they should be here under Rule 19. That's the basis for the underlying motion. Is there anything impeding you from bringing in the Secretary under Rule 14? Your Honor, from our perspective, Rule 14 is very appealing, but it doesn't get us to the question that I believe Judge Kleinfeld mentioned and also Judge Ho regarding the damages for the class. Rule 19 doesn't help you on that either. I mean, there's no way you can get damages from the United States government after the United States government consents. Pretend you're an investment bank in New York, you'll get lots of money. I understand, Your Honor. But my point is that for us, the issue that's been presented is not Rule 14. The issue that's been presented is Rule 19, and we're obviously focused on why the Secretary of Interior is necessary under Rule 19. But what you're really after or the only thing you're capable of getting out of the government, out of the Secretary of Interior, whether Rule 19 or Rule 14, is a declaration of law, and I have trouble seeing exactly how the Secretary of Interior is going to be all that useful to you or any more useful if the Secretary is an Interior. I mean, you're obviously, the Secretary of the Party, you're obviously taking depositions of the former Secretary. I mean, any discovery you want out of them, you can get. The USC did take the deposition of the former Secretary of State, excuse me, Secretary of Interior, Stuart Udall. But, Your Honor, in terms of what we could get in terms of declaratory or injunctive relief, I mean, clearly we would need to know from the Secretary what the Secretary is going to do going forward if this lease term is, in fact, invalidated. And that would be the purpose of the injunctive relief. Counsel, I just keep losing the thread of the argument. It seems to me you've already demonstrated very powerfully that the Secretary of the Interior is on your side. This is the Secretary's form. It's the Secretary's idea. It's the Secretary's way of promoting employment opportunities on Indian reservations that sorely need them. You've got that already. What you need is money because you're going to have all of the non-Navajos who live in near the Navajo reservation popping into this class and saying, oh, yeah, I would have worked at that coal mine, except I knew that I didn't have a chance of getting a job, so I should get a share of the punitive damages as well as back pay. And the Secretary can't give you the money. And what's more, even if we could enjoin the Secretary to quit doing this in his leases in the future, Peabody would still get stuck for the money for doing what the Secretary had told Peabody to do and required Peabody to do on the forms. I don't understand where it helps you any to get the Secretary in on concrete terms, and I think concrete terms are what Rule 19 require. That's why I'm confused. Your Honor, let me address the question of what we could get from the Secretary. The EEOC suggests in its brief that the Secretary could cancel the leases, but the Secretary might not. Instead, the Secretary might decide to assess the damages against Peabody. Now, frankly, the idea of Peabody facing cancellation of the lease, that would be important to us to have injunctive or declaratory relief on. There's no question. The possibility that instead we might be subjected to a damages finding by the Secretary of Interior for no longer being able to follow the lease provisions that require the tribe's specific preference is alarming, and it is exactly the kind of multiple, inconsistent liability that the second part of Rule 19 contemplates. Are you saying, I'm not sure I understood you, that if you got the Secretary in, then you could have both the Secretary and the tribe be in as parties, so maybe you could get a cancellation or reform of the lease so you wouldn't have a continuing contractual obligation to discriminate in favor of Navajos that exposes you to continuing damages? Yes, Your Honor. And you think you need to have them, hypothetically, if we were to rule that the Navajo preference in the lease, as it now exists, violates Title VII, do you think you need the Secretary to come in here to relieve you from future compliance with that lease? Current compliance, Your Honor. I mean, there's no question, but certainly future. The question from my side was, future compliance, what do we do going forward? I think once we get a final judgment, if it says that lease violates Title VII, it's inconceivable to me that we need an order running directly against the Secretary. But, Your Honor, the other part of this, though, is that the EEOC suggests that the Secretary might decide, if such an order was issued, to reform its leases in order to comply with the judicial holding. I think more than might. Well, I understand. Does the Secretary have legal title to the land subject to the Indian Reservation on the land and the interest as trustee in the leases? Yes, the Secretary of the Interior holds the land in trust for the Navajo Nation. So the Secretary's real estate, where they're digging out the coal, is subject to the Navajo rights to a reservation then? Well, I believe that the Navajo Nation might see that in a flip around, that it's the Navajo's land that the Secretary is holding in trust. But I think your point being that the Secretary of the Interior basically controls the land rights. We're talking this is reservation land. This is reservation land. There's no question this is reservation land. I have a question. It's a little bit different. I'm wondering how the district judge was not bound by our prior decision in this case. What is it that's different that he didn't have to comply with what we said? Your Honor, for purposes of the issue of whether the Secretary of the Interior is necessary in a dispensable party, your decision did not reach that issue because that issue was not raised in the prior proceedings. It was raised below in the district court in the first action. No. In the first action, what Peabody said is the Secretary of Interior required and approved these lease terms. And we did not move to dismiss the case on the basis that the Secretary of Interior was necessary in a dispensable party. So you did not have to reach that issue. Your Honor, wouldn't you have been obligated to raise that before the matter was brought to us on appeal? Wouldn't that be something that would have been incorporated in your total case? The Navajo Nation has raised it as part of the Navajo Nation's case. The Navajo Nation is the movement on this motion to dismiss. And one of those bases is that the Navajo Nation believes the Secretary of Interior is necessary in a dispensable party. It's upon their arguments. The Navajo Nation is making that argument, but it seems to me that it's an argument entirely for your benefit. I mean, you're the one now arguing in favor of the decision. Your Honor, there's no question that Peabody supports that portion of the Navajo Nation's argument, and we did join it. There's no question. But I don't think the Navajo Nation is making that exclusively for our benefit. The Navajo Nation has 326 other leases that have a tribe-specific employment preference in them. For the Navajo Nation, they have stated in their briefs that that essentially unravels material lease terms that form the basis of their economic development on the reservation. There are no other businesses on the reservation except businesses that have business leases or the Navajo Nation's own governmental departments. I'd like to get back to my question with regard to our prior case and how you've explained the reason why the Secretary of Interior aspect of that argument is different. But how about the other? It seems like we've flat rules that after joining the Navajo Nation and the Navajo Nation was joined, and now it's back before us on what basis? It's back before you on the basis of the application of the Navajo Hopi Rehabilitation Act. It's back before you on the basis of the jointer of the Secretary of Interior, which is part and parcel. Well, unless I'm a Secretary of Interior. Okay. And obviously the Navajo Nation was brought in pursuant to an amended complaint in this action. Yes. The Navajo Nation has put forth many arguments in its briefing regarding the fact that it believes that that amended complaint does, in fact, behind the pleadings ask for affirmative relief against the Navajo Nation. And that's really the crux, Your Honor, of the Navajo Nation's position. So that's a question I want to get to. Is it the basis for the district court on that aspect of it is that affirmative action was asked for against the Navajo Nation? Yes. One of the basis for the district court's decision is that the Navajo Nation is, in fact, when you look behind the pleadings, being subject to affirmative relief by the agency. What's the other basis for distinguishing? The other basis for distinguishing is you don't want to talk anymore about Rule 19, but the other basis is the Rule 19 jointer of the Secretary of Interior and the Navajo Hopi Rehabilitation Act application to the actual statutory preference. So that is now our bond is going to leave the district court's decision on remand. It was on the basis that affirmative relief had been asked against the Navajo Nation. Yes. Some discovery had revealed something else. Yes. The court did believe that when you went behind the actual pleadings and you looked at what was the effect of the relief that was prayed for in the complaint, specifically the section of the prayer that asked for the parties in conjunction with Peabody to be enjoined, which would include the Navajo Nation, that, in fact, the relief really is affirmative against the Navajo Nation based upon prevalence And I should say the uniform requirement of tribe-specific employment preference in these leases as well as those 300 and some other leases. Well, isn't that always the case when we have a situation where an injunction is imposed under our rule that it also includes an injunction against anyone acting in concert with that person? But that doesn't bring them in as parties or affirmative relief or anything else. But, Your Honor, the Navajo Nation has fighted numerous cases that basically say the court needs to go behind the prayer and actually look at the effect of the relief that's being asked for. Wouldn't that be always the case in the event of an injunction that's granted under our rules that anyone who is bound by that not to act in concert, that there would be some sort of an affirmative action on their part? I don't see that. Well, Your Honor, the previous decision that this court reached was that the Navajo Nation could be joined because at that time the court believed that there was no affirmative relief being asked for and that there was no need to be able to state a separate clause for action or claim for relief against the Navajo Nation in order for it to be joined. Now, we're not here arguing that there's a clause of action against the Navajo Nation and that's not what Judge Murguia reached. I mean, Judge Murguia basically looked behind the prayer, now that the Navajo Nation has been added as a defendant through the amended complaint and determined that based upon the record evidence in this case, the fact of their being asked to join others acting in concert reached to the Navajo Nation and frankly undermines their entire economic position. If we had approved the kind of an injunction that would be required, that's a normal consequence of any injunction under our rules, is that persons acting in concert are also joined. I don't disagree that that's a consequence of the way this is ruled. So there's nothing new that the district court found. But the district court prior did not have the evidence submitted by the Navajo Nation. I mean, that was one of the things that was necessary. What does the evidence have to do with it? The evidence didn't really have anything to do with it. It's a question of whether an injunction granted against Peabody was also going to include some sort of, as the rule provides, that those acting in concert are also enjoined. That's nothing new. That didn't require any new facts. But, Your Honor, your prior decision specifically found that the Navajo Nation was necessary because it had interest that it should be able to advance in this litigation, which is exactly what it did when we went back to the district court. And part and parcel of that was the introduction of evidence regarding the basis for the lease provisions and the numerosity of those provisions. I hesitate to say this when you say what the opinion below did and didn't do. But as I recollect that opinion, the reason we said that this was a necessary party was not because directly of anything that we thought that the Navajo Nation had to do, but rather to protect you, Peabody, from a later collateral attack by Navajo, that is to say the rest of the consequences of the decision. That was the basis for the whole thing. That's clearly a basis, and I don't disagree with that, but we did not advance the arguments of the Navajo Nation. We identified that they might have an interest in this litigation. We thought that they had an interest, and very clearly we did not want to be subject to, you know, inconsistent relief and inconsistent actions by the nation. That's why we allowed the Navajo Nation to be brought in on this action, of course. And the same is true for us with the Secretary of Interior. But the bottom line is that we did not advance all of the arguments that the Navajo Nation has made regarding its interests, including its treaty rights, including its rights that it has reserved in all of those leases. What other affirmative action is involved other than their complying with the injunction? You know, I think the troubling issue for them is the issue of sorry deficits. I mean, if we have a ruling here that basically says you can't have in these provisions, you can't have a tribe-specific employment preference because it violates Title VII, I don't think that this court would basically – Would that be affirmative action against the – Well, because what it serves to do, if you look behind the complaint, is essentially unravel all of those material terms. I mean, they have stated that it's a material term to have tribe-specific employment preferences, and that's how they, in fact, develop their economy on the reservation. All right. Thank you. Thank you. Yes. We still have a lot of time for you. Thank you, Your Honor. Three factual clarifications. The 326 leases that have been mentioned several times this morning, I do not believe that they are actually in the record, the leases themselves. There are affidavits from tribal managers who each attest that they're aware of a certain number of leases that are either current or recent, and that's why we put in our opening brief that it's not possible to tell from the record below how many of these leases are actually current and how many of them are – What effect would it have on all the other leases? It should not have any effect whatsoever. I just wanted to point that out for a factual clarification. I'm sorry. Yes. Your thought is very decisive. Yes, very decisive, absolutely. Yes, absolutely. So that part of the frustration that Judge Kleinfeld expressed earlier, and that is, we're wondering sort of, why is EEOC doing this? It seems like, once again, it's a policy decision. It's a very strange thing where all of this was being done to improve the situation on the reservations and so forth, and now the EEOC action is a complete disruption of that. I wouldn't say a complete disruption, and let me say, first of all, we are simply attempting to effectuate congressional policy, and secondly, that as Judge Kleinfeld mentioned, I believe it was your Honor, that there's a lot of intermarriage. There are people who could be living on the Navajo Nation who are Native Americans  and making sure that they have money to pay the rent, and so Congress authorized a presence for Native Americans living on or near the reservation, and frankly, I assume that most of those jobs would continue to go to Navajos because I assume that they're the majority of Native Americans in this region. Can I back you up just a moment for one of the things you said as part of your last response? That is to say, you're saying you at the EEOC are trying to implement congressional policy, but obviously there seems to be a disagreement between the EEOC and the Department of Interior as to what congressional policy is. Is that a fair statement? I can say to you that we see leases that have the approval signature of the Secretary of Interior that contain these tribal-specific preferences. And we've got a fairly longstanding practice of the Secretary to approve such leases. That's right, and I wish I could stand here and say that the government had resolved that internal conflict before I arrived. Now, this may be outside the record, and it may turn out to be entirely irrelevant, but I can't resist asking, have you folks been in conversations with the Secretary of Interior over this question? Yes, we have. And? And with the Solicitor General's Office about the fact that there's a dispute, and there's not yet a resolution, but it's been called to people's attention. I trust that there will be a resolution. Oh, there must be. Has the Secretary in these conversations, again, I understand it's outside the record, and I suspect it's totally irrelevant to our decision, has the Secretary indicated any interest in intervening in this lawsuit? No. The Secretary could do so, I assume. That's correct. Is there any jurisdictional obstacle, sovereign immunity or otherwise, that would prevent the Secretary from being joined for declaratory injunctive relief, either as a Rule 19 defendant or as a Rule 14 third-party defendant? I believe there's no impediment to the Secretary being joined as a Rule 14 defendant by Peabody. The EEOC could not do that, but I believe Peabody could. And let me – I understand Rule 14 for the moment. Yeah. Why, in your view, can't the Secretary of Interior be joined under Rule 19? We lay that out in our brief, and – oh, I can't – Why cannot? We – Because I'm not sure I see that the Secretary of Interior cannot be joined. What's stopping you from naming the Secretary of Interior as an additional party defendant? We are not an – EEOC is not an independent agency. We are a quasi-independent agency. We are an arm of the President, and we cannot take unilateral actions against another federal agency without the approval of the Solicitor General. And so I can tell you that this is not going to happen. So the obstacle is not because of some particular protected status of the Secretary. The obstacle comes from an inhibition on your power. Well, I assume so. In fact, I didn't research that because I knew it wasn't a possibility. So I apologize. I can't give you a more in-depth answer. But I would like to say that Peabody, in its brief at page 39, seems to acknowledge that the Administrative Procedures Act 5 U.S.C. Section 702 is available to it. It says EEOC correctly identifies that as a statute permitting a challenge that – for Peabody to seek injunctive and declaratory relief from the Secretary of Interior. I wanted to call that to attention. It seems to be a concession on Peabody's part. Secondly, I'd like to point out the Navajo Nation said that the Department of Labor solicitor gave his opinion that tribal-specific sufferances are lawful under Title VII. Whatever that opinion says, and the Nation simply quotes another source that references some opinion in 1973, whatever that said, it's been overridden by formal Department of Labor regulations that were adopted in 1978 pursuant to notice and comment and would be entitled to deference by this Court, as we note in our reply brief. Third, with respect to Peabody's statement that there's no dispute that the preference was draft. I think as far as the regulations go, isn't there a Federal Circuit case that says your interpretation of the set of regulations does not apply here? Navajo Nation, I think it's called? There is litigation that addresses a different issue, the Navajo Nation's claim for money damages. And in that context, that case has gone up and down the various court levels several times. The last reported decision was from the Federal Circuit in September of 2007, in which the Federal Circuit said that the Navajo Nation's claim for money damages against the United States could be premised on a network of statutes and regulations, one of which was the Navajo Hopi Rehabilitation Act of 1950 and cited a specific provision in Section 358, I think it is. It's a later provision than, I think, 338, that says the Secretary of Interior must keep the tribe apprised of developments that are taking place with respect to programs on the reservation. And I think the Federal Circuit concluded that the Secretary of Interior had breached its trust of, among other things, keeping the Navajo Nation apprised of things that were taking place on the reservation with respect to alterations in this lease contract that had to do with raising the rate of payment for coal that was mined by Peabody. A different issue and setting a different provision had nothing to do with the tribal hiring preference at issue here, but what is significant about that litigation is that in that case, the Secretary of Interior has taken the position and the United States government has taken the position that the leases at issue here were not entered into pursuant to the Rehabilitation Act of 1950. So that is a matter of public right. You asked what the Secretary of Interior's position is. I don't understand why they're not, frankly. The language seems to provide for them in addition to projects. There isn't any evidence that says they weren't. Are you referring to the lease provision? I don't understand why they're not entered into pursuant to both acts, the Mineral Leasing Act and the Rehabilitation Act. And that the Federal Circuit case says that the exception only applies under one. And there's no evidence that says they're not under both acts. They seem to fit the language of both acts. I'm just missing something in your argument here. I realize we have a different view on this, but our argument is simply that the hiring preference in 633 pertains solely to the projects that Congress authorized the Secretary to undertake in 631. One of the very old canons of statutory construction that long precedes Chevron deference is that we accede to a longstanding construction of the statute. Here we've got 50 years of the BIA interpreting the statute a particular way and, in fact, requiring companies that enter into leases on Indian reservations to give tribal preferences. That's not exactly accurate. In fact, what we have is 50 years of the Department of Interior approving leases that contain a hiring preference, but no indication during that period of time other than former Secretary Udall's very recent deposition testimony, no indication that that approval, not that it was done pursuant to the Rehabilitation Act. But it's their form. It's their form, right, but not under the Rehabilitation Act. That was under the Indian Mineral Leasing Act of 1938, which contains no hiring preference. So then the question is, could the Secretary, and this is a question that goes to the substantive legal issue not yet before the Court, could the Secretary of Interior authorize hiring preferences where there's no statutory authorization in the 1938 Mineral Leasing Act, but simply do so as a matter of personal discretion? And I'm sure that the Secretary could before Congress enacted Title VII. And then the question becomes, could the Secretary continue to do that after Congress spoke in Title VII in 1964, which became effective in June of 1965? So your argument on that one is, well, these form leases predate the Rehabilitation Act. That's right. And, in fact, the forms that Peabody provided to this Court in their appendix, actually that we include in our appendix because Peabody relied on them below, are dated October 1957. And those are the forms that they say were used to prepare these leases, one of which was clearly prepared before Title VII was enacted. So it may well be a longstanding instruction and longstanding practice of the Secretary of Interior, but since it predates the Rehabilitation Act, it's a longstanding practice not relying upon the Rehabilitation Act. That's correct. What about the fact that the Rehabilitation Act was amended twice in the 9th Amendment after the CEOC Act? Those two amendments repealed two provisions by which Congress had ordered, I think, the Department of Interior and possibly the Navajo Nation to continue to do things after 1950. And at some point, it became no longer necessary for the Department of Interior to do those, but absent repeal, the Department would continue to be obligated to do so. So Congress did repeal two provisions that imposed ongoing responsibilities to make it clear the Secretary no longer needed to do that. The Secretary did not otherwise amend the Act, did not most significantly, did not add any new projects after it was around 1957 or 58 that the project for construction of roads, additional monies was added to that because it was clear that the road construction was not adequate otherwise. There's not been a single project added since 1960 and not a single extra dollar added to any of those other 14 projects that Congress enumerated in 1950. But most importantly... I guess my concern is it was amended twice without any reference whatsoever to Title VII, which apparently was in conflict according to the EEOC at that time. Well, actually, I'm glad you clarified. I meant to say this as well. We believe that a proper reading of both statutes imposes no conflict whatsoever and would give Congress absolutely no cause to amend Section 633, and that's because the way it's written, it applies to those projects, which in 631, the Secretary is entitled, is directed to undertake. Those projects were completed by the early 60s. Congress said to complete them within ten years of 1950. They apparently were actually completed within the early 60s before Congress enacted Title VII. That omits what Judge Hugg pointed to earlier, which is 635. Right, and that has to do with something different. Those are leases that have to do with private businesses that would then come under the reservation and take advantage of the infrastructure construction that 631 had authorized. That was obviously the goal here. I think Judge Hugg and Judge Fletcher both pointed to this language, may be leased by the Indian owners with the approval of the Secretary for business purposes, including the development or utilization of natural resources. And I looked at that regulation you cited, Stu, at 25 CFR Part 162, and I don't see where it's broad enough to mean that mining coal wasn't utilization, development or utilization of a natural resource. At the beginning of that section, there's a definition provision that says what it covers and doesn't cover, and it says it expressly excludes mineral leasing. Where's that? I don't have the exact site, although I could provide it. There's a statutory exclusion, not just regulatory? No, a regulatory exclusion. A regulatory exclusion. Yeah, the statute has regulations that 635 have regulations that implement it for that particular form of leasing, and the regulations have a definitional provision that says this does not apply to. And when was that regulation promulgated? I don't have that, Dave. I could supply it to the Court. But you would argue, I suspect, that that regulation is entitled to Chevron deference. Yes. And if the Court is interested, the United States Government has taken a formal position on what that means. What I just said is a public record, the government's position, as stated in the reply brief that the government filed in its petition for certiorari from the Federal Circuit's decision that we were discussing earlier, the September 2007 decision in Navajo Nation versus United States. That is on petition for cert. The Court will be conferencing it September 29th, so that for whatever references the Court might make to the Federal Circuit's decision, I want the Court to be aware that's subject to further review, potentially. You know, there's a very famous article written by David Curry at the University of Chicago early in his career on admiralty, describing admiralty law as, quote, the devil's own mess. I don't think admiralty has anything on this case. If I could avoid commenting on the fact that there's a disagreement between EEOC and the Secretary as to the interpretation of those two provisions. Why the EEOC doesn't go to the Secretary and say, look, you shouldn't be putting these things in your laces. Instead of exposing business organizations that are trying to do what was designed to be done, provide employment and industry and so forth on reservations, you seem to be ironing out your dispute at the sufferance or at what is going to be eventually paid by some of these employers who are doing the very same thing that people are wanting to be done. Just because there's a dispute as to who, whether it's a tribe or whether it's Indians that are living near, just that dispute is going to raise all sorts of liability prospects for the very people that want to come in and help the reservations. I have a couple of responses to that. One is I suspect that Your Honor's comments might help to move this process along back in Washington. Another is that the EEOC does not go on fishing expeditions here where we have not received any charges. We have not looked into whether or not there's been anyone adversely affected by these leases, although we know they exist. Third, I want to point out, it's not a dispute between the interpretation of two provisions. The Secretary, at least today, is not relying on the Rehabilitation Act or saying it in any way applies to this. It's a question of the EEOC's interpretation. I don't know what the Secretary is doing. The Secretary is standing up. Well, it's a matter of public record in the petition for cert and the reply brief, and I could give the court the URL sites if you want to. Yeah, I would appreciate that. Yeah. You know, it's here. Your Honor, maybe what we can do is continue as long as you are. I suspect we're going to hear something from Mr. Fry, and you might have a chance to find it. Yeah, I can tell you the docket number for the petition is 07-1410. 07-1410. That's United States versus Navajo Nation. But the Supreme Court does not make petitions available online, unlike briefs filed in the merits. But the Department of Justice makes the briefs that it files. I think armed with this, we can find it. Okay. So I'd like to point out that the Secretary's discretionary actions under the 1938 Indian Mineral Leasing Act, in which the Secretary has continued to approve leases that contain a tribal-specific preference, versus this Court's interpretation of Title VII, which the ESG relies on. And let me just point out for Judge Kleinfeld that our reliance on Dallivan Dual I, we mentioned for the first time in our opening brief on page 2, footnote 2, where we point out that that's this Court's views, and we adopt them there. And then in our reply brief, starting on pages 7 and continuing to page 10, we discuss at length the fact that this Court has previously ruled on the legal issue of how to interpret Title VII. All right. Thank you very much. May I just make one more quick point? All right. Thank you so much. The Council for Peabody said that it's undisputed that the preference here was drafted by the solicitor of Interior, I mean the Secretary of Interior and required by the Secretary of Interior. And former Secretary Stuart Udall in his deposition testimony did say that members of his staff drafted the lease, but when asked about this preference in particular, this provision, he says on page 60 of his deposition, did anyone at the Department of Interior ever tell you the Navajo Nation bargained for this employment preference provision? He said, oh, yes. That was the whole analysis I participated in. Do you remember who told you that the Navajo Nation bargained for the employment preference provision? Well, it would be the staff people I relied on. And that's at page 81 of our excerpts of record. All right. Thank you. Thank you. I appreciate the extra time, Your Honor. Judge Kleinfeld is accurate. The Federal Circuit thoroughly rejected this notion that the regulations under 635 only allowed 635 to be construed as applying to business site leases and not mineral leases. The mineral leasing regulations are at 25 CFR Part 211. And the Indian Mineral Leasing Act of 1938, Section 396D, tells the Secretary of the Interior for all mineral leasing under both the 1938 Act and any other act relating to mineral leasing, such as 635A, those operations are supposed to be conducted pursuant to your regulations under this act. And that's what's been done. And so the leases were approved under regulations typically associated with the Indian Mineral Leasing Act of 1938. But 635 clearly authorizes mineral leasing. And it talks about leasing of natural resources. The notion that in 1950, Congress was thinking of bingo halls on the Navajo Reservation and spas and resorts is absolutely ludicrous. There weren't roads out there at the time. And I would like to also make a correction to counsel's representation that we don't have the leases themselves in the record. We have examples of the leases themselves in the record. I would look at our record excerpts at 142, a funeral home. The lease is in accordance with the provisions of 25 U.S.C. Section 415, typical business leasing act, and 635. Same thing on the record excerpt 137, in accordance with the provisions of 25 U.S.C. Sections 415 and 635. These are in the record. The reason we don't have all, what, 326 of them in the record is twofold. One, it's 10 boxes of material. Two, we offered to produce those to the EEOC, and the EEOC said, we don't want them. And that's an email string that's in the record at pages 99 through 107 of our record excerpts. I think it is very telling that Congress amended the Rehabilitation Act twice since Title VII was passed. One of those amendments is very telling, I think, also, and that is the repeal of Section 639. The notes there talk about the programs and the accounts that were no longer needed. And those programs and accounts were the ones authorized under Section 631. That repeal did not happen until 1996, and it was effective 1997. So the accounts were still present for those, what, 46 years? But my basic problem is not affected by that one way or the other. My basic problem is how am I supposed to define the word project that appears in 631 and in 633, what does not appear in 635. Project, which is 631, and then 633 just refers to projects. Projects is pretty clear, at least as they're set up in 631, government grants to do certain things. Each one of them involves a government grant. 631 involves a government appropriation. These leases do not involve government grants, and they certainly don't look like projects, as 631 seems to contemplate project. That's my problem. The way I would resolve that, Your Honor, is to look to the person, Stuart Udall, who had a very good memory of these circumstances, and he was the person who was charged with implementing the act. And what he called the Peabody leases and the related development, including the Salt River Project plant at Ishu-Indawa-Vendawa, he called these the centerpiece of the development program authorized by the Rehabilitation Act. Well, of course, that's 635. But that doesn't mean it's a project within the meaning of 631. My own 635 is right there as part of the act. I understand that. But him saying this is part of the act, I understand perfectly. It makes absolute sense. But that does not speak to the definition of project under 631, and then it's used in 633. Again, however, Secretary Udall testified that it was his department's interpretation of the Rehabilitation Act that this lease was required to have a tribe-specific employment preference because of the Rehabilitation Act. Well, if that's how he reads the act, he's out of his mind, because there's nothing in the act that requires that. There's something in the act that permits that. Yes, and he viewed that as his trust obligation to implement that to the fullest extent possible. And, in fact, the statute said to the maximum practicable extent. That's what's said in, I think, Section 633 itself. But it says, yeah, practicable extent. And, by the way, this court in 1981 held, well, at least observed in Austin v. Andrus, that this particular lease was at least an outgrowth of- This litigation has been going on for so long, I hate for anything that might extend it any longer than absolutely essential. But as you are increasingly relying on Secretary Udall or former Secretary Udall's deposition, increasingly I'm thinking, well, you know, maybe we'd better go back and tell the district judge you shot off discovery too soon, because this looks as though, at least as you're now arguing, that this is a question of fact, of practice, and so on. This can't be resolved simply by looking at the statute. And I have to say that the district judge sandbagged just a little bit, saying, I may well convert this to summary judgment motion, but did not give proper warning to the EEOC that it would do so, and I think the discovery that they would have taken had they known- I mean, if we're going to get into that, I'm about to say, at least speaking only for myself, that this was prematurely and improperly converted into a summary judgment motion. I would disagree thoroughly. And respectfully. The EEOC attached 16 exhibits to its response to the motion to dismiss. Under Olson and the other cases of this circuit, that shows that they had noticed that in itself. But in addition, the court invited the EEOC to ask for additional time for discovery if it really needed on a proper showing. They did it once without even an affidavit of counsel. And the judge said, sure, take it. There was not any request for additional discovery by the EEOC. Thank you very much. Didn't there be one 56F request that it was granted? There was actually, it wasn't even in the form of a 56F motion. It was just a request to the judge to extend the discovery deadline, Your Honor, in the form of a motion. And she granted that motion. In part. They wanted longer than she gave them. Yes. But she said in that order, if you want more, let me know. And there was not a peep. And there wasn't anything in the responding papers of the government, of the EEOC in this case, that suggested that their presentation was hampered by a lack of discovery. Thank you. I think those were very helpful arguments. It's a difficult case and we appreciate that. Very thoughtful. Thank you.
judges: Hug, Kleinfeld, Fletcher W.